# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50077 | **DATE** | 1/6/2005 |
| **CASE TITLE** | Dahlgren v. Barnhart | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  In accordance with the attached, it is the Magistrate Judge's Report and Recommendation that the ALJ's decision to deny benefits to Plaintiff be sustained, affirming the ALJ at all steps of the disability determination process as outlined above.  It is the Magistrate Judge's further Recommendation that Defendant's Motion for Summary Judgment be granted, and Plaintiff's Motion for Summary Judgment on the administrative record and pleadings be denied. Parties are given ten days from service, as calculated under Rule 6, to file objections with Judge Reinhard, pursuant to Fed. R. Civ. P. 72.  Objections need not be presented as stated in L.R. 5.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | 1-7-05 | |
| | Notified counsel by telephone. | | date docketed | 21 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 1/4/2005 | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| AM | courtroom deputy's initials | | GG | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

JUDITH DAHLGREN,          )
                                  )

        Plaintiff,         )        Case No. 04 C 50077
                                    )

        v.               )        Magistrate Judge
                                    )        P. Michael Mahoney

JOANNE B. BARNHART,      )
COMMISSIONER OF SOCIAL    )
SECURITY,               )
                                  )

        Defendant.      )

## REPORT AND RECOMMENDATION

Judith Dahlgren ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").

42 U.S.C. §§ 416, 423. This matter is before the Magistrate Judge for Report and

Recommendation pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. §

636(b)(1)(B).

## I.    BACKGROUND

Plaintiff filed for DIB on August 7, 1997 (Tr. 114), and her application for benefits was

denied on December 5, 1997. (Tr. 91). Plaintiff filed a request for reconsideration on December

9, 1997, and her application was denied after reconsideration on January 26, 1998. (Tr. 95-96).

Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on

January 29, 1998. (Tr. 99). Plaintiff appeared, with counsel, before ALJ J. Robert Brown on

December 11, 1998. (Tr. 392). In a decision dated October 22, 1999, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 32-42). Plaintiff's request for a review of the ALJ's decision by the Appeals Council was received on November 19, 1999. (Tr. 349). On August 2, 2001, the Appeals Council vacated Plaintiff's original hearing decision and remanded Plaintiff's case for further proceedings.[1] (Tr. 374-76). Subsequent to the remand, a hearing was held on April 24, 2002, before ALJ Cynthia Bretthauer. (Tr. 425-69). On May 30, 2002, ALJ Bretthauer found Plaintiff was not entitled to DIB. (Tr. 28). Plaintiff filed a request for review on June 4, 2002. (Tr. 16). Plaintiff's request for review was denied on November 7, 2003. (Tr. 3-5).

## II.  FACTS

Plaintiff was born on November 15, 1953, making her forty-five years of age at the time of her December 11, 1998, hearing before ALJ Brown and forty-nine years of age at her April 24, 2002, hearing before ALJ Bretthauer. (Tr. 112, 396, 425). Plaintiff completed her education through high school, plus two years of college. (396). At the time of her hearings, Plaintiff lived with her boyfriend. (Tr. 466). Plaintiff was approximately five foot three inches tall and weighed approximately152 pounds. (Tr. 70). Plaintiff's primary impairments noted by ALJ Bretthauer were cervical fusion, bulging disc, fibromyalgia, confusion, decreased concentration, and elevated liver enzymes. (Tr. 21).

Plaintiff had no reported income since April 24, 1993. (Tr. 13). From 1979 to 1981, Plaintiff worked for UPS as a loader, driver, and driver supervisor. (Tr. 123). Plaintiff was paid $2,500.00 per month for her services. (*Id.*). From 1981 to 1982, Plaintiff worked for Fed Ex as

---

[1]Plaintiff was insured for disability benefits through December 31, 1998, so she must establish disability on or prior to this date. (Tr. 21). The basis for the Appeals Council remand of this case was a miscalculation of the last insured date, which was mistakenly noted as December 31, 1997. (Tr. 23).

a delivery driver at a rate of ten dollars per hour. (*Id.*). From 1982 to 1985, Plaintiff worked for a food catering business as a delivery driver on commission. (*Id.*). From 1985 to 1993, Plaintiff worked as a delivery driver for an office products and furniture business, where she was paid nine dollars per hour for her services. (*Id.*). Plaintiff worked for Tempro Office Products as a driver from 1993 to April 24, 2003. (Tr. 145). Plaintiff worked nine plus hours a day, five days a week. (*Id.*). Plaintiff was paid nine dollars per hour for her services. (*Id.*). Plaintiff was terminated from her job with Tempro due to injuries sustained in a work-related automobile accident, but Plaintiff did return to Tempro for a short time period after her accident, performing office work until she was let go. (Tr. 145, 435).

Plaintiff stated at her hearing before ALJ Bretthauer that she could not do much during her typical day since she stopped working. (Tr. 450). She reported a daily routine that included reading newspapers or books propped up at eye level, preparing dinner by working in shifts of activity, dusting, and taking care of laundry and shopping with assistance from her boyfriend. (Tr. 451). Plaintiff stated she could not push a grocery cart. (Tr. 451). Plaintiff explained that she could bathe and dress herself, but noted that doing so made her uncomfortable and tired so she limited showering to twice a week. (*Id.*). Plaintiff reported spending most of her time on the couch laying down, approximately eighteen hours a day. (Tr. 460).

Though Plaintiff has a driver's license without restrictions, Plaintiff does not drive much. (Tr. 432-33, 438, 453-54). Plaintiff took a trip to Florida at the end of 1993, but did not drive herself. (Tr. 438, 372-73). Plaintiff stated she mainly stayed on a couch in Florida, but did occasionally go out for dinner. (*Id.*). Sometime in 1995 or 1996, Plaintiff rode to Philadelphia for a funeral. (Tr. 459). Plaintiff reported that the trip made her feel horrible and that she spent most of her time on a relative's couch. (*Id.*). Plaintiff occasionally went out for dinner and

visited family and friends. (Tr. 454-55). Plaintiff also visited the racetrack with her boyfriend once a week or once a month when she lived in close proximity to the facility. (Tr. 456).

Plaintiff testified at her hearing that mental and physical impairments prevented her from working even light duty jobs. (Tr. 435-36). Plaintiff stated that mental confusion, limited use of her arms and neck, inability to lift, bend, or squat, and restricted sitting, standing, and walking kept her from being able to work. (Tr. 436). Plaintiff stated she could not do assembly line work or desk work because her neck would be in the wrong position if she had to look down. (Tr. 436-37). Plaintiff stated she was diagnosed with Fibromyalgia[2] by Dr. Pupillo in 1994. (Tr. 442). Plaintiff expressed that she could walk one to two blocks, but could not use a cane for assistance like she wanted to because it hurt to grip the handle. (Tr. 448-49). Plaintiff stated she could stand five minutes at a time and sit for an hour at a time without moving. (Tr. 449). Plaintiff thought she could lift ten to twelve pounds on an irregular basis. (*Id.*).

Plaintiff explained that she did not seek medical treatment between 1994 and 1997 because she had no insurance. (Tr. 441). Also, from 1997 to 1999, Plaintiff stated she did not take prescription medications because her stomach could not tolerate pills. (Tr. 443-44). Plaintiff opined that even though she hardly sleeps, she did not think sleeping pills "were worth it" because they only made her sleep four hours in a row. (*Id.*). In the past, Plaintiff tried pain

---

[2]The Seventh Circuit described Fibromyalgia in *Sarchet v. Chater*, stating:
> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body *(and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia)* that when pressed firmly cause the patient to flinch.

78 F.3d 305, 306 (7th Cir. 1996)(emphasis added).

relievers like Darvocet, Acetaminophen with Codeine, and Motrin. (*Id.*). Plaintiff stated she did not seek mental health treatment for her confusion[3] because she did not want "to be considered a nut." (Tr. 444). Plaintiff also stated her confusion was not that severe, and that she did not think she could afford treatment. (*Id.*). Plaintiff tried an anti-depressant for her Fibromyalgia symptoms in 1997, but stated she did not like the way Zoloft made her feel. (Tr. 445).

Plaintiff reported that her pain primarily affected her right arm during the period of 1997 and 1998. (Tr. 446). She relayed at her hearing that the pain from her neck was "piercing" when she moved her right arm or her neck. (Tr. 446-47). Plaintiff thought her pain got "either worse or the same" in 1997, when she began seeking medical treatment again. (Tr. 447). By then, Plaintiff also developed lower back pain. (Tr. 448). Plaintiff stated her therapy programs caused her to be in so much pain that she would not be able to do anything on the following day. (Tr. 453).

Vocational Expert ("VE"), Susan Entenberg, was present at Plaintiff's hearing for questioning. (Tr. 462). The VE described Plaintiff's past work as a driver as semi-skilled and heavy work. (*Id.*). The ALJ then asked the VE whether a hypothetical female, with the following characteristics, could perform work in the economy:

> [A]n individual who as of December '98 was 45 years old, had the work experience and education of this claimant, and had the following exertional limitations: could sit for six hours, stand and walk for six hours, lift and carry frequently up to 10 pounds, occasionally up to 20 pounds, could do no repetitive pushing and pulling, further assuming someone who could only occasionally stoop and occasionally climb stairs and ramps, but could never climb any ladders, ropes, or scaffolds. Also someone who could occasionally crouch and someone who could do no repetitive reaching above shoulder level with the right upper extremity.

---

[3]Plaintiff reported examples of her confusion at her hearing, noting that she sometimes would forget which drawer her dishes were in, or she would forget where she was driving to, even on short trips.

(Tr. 463).

The VE testified that such a hypothetical female could work at jobs such as a cashier (40,000 jobs in the Chicago Metropolitan area), packer (8,000 jobs), and assembler (15,000 jobs). (Tr. 463). If Plaintiff could do no overhead reaching, the VE testified that she would reduce the jobs available to Plaintiff twenty percent across the board. (Tr. 464). The ALJ further limited her hypothetical to restrict repetitive grasping with the right hand and inquired into the impact on Plaintiff's work. (*Id.*). The VE stated the assembly jobs would be eliminated. (*Id.*). The VE further stated that Plaintiff could not do any of the jobs if she were limited to only occasionally moving her head side-to-side or up and down. (*Id.*).

Plaintiff's attorney posed a new hypothetical to the VE, asking whether a hypothetical female, with the following characteristics, could perform work in the economy:

> same age, education, and past work experience that this individual who could stand or walk for no more than a total of two hours in an eight-hour workday, lift more than 10 pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, small tools, could only perform activities such as bending, stooping, crouching, kneeling, and crawling occasionally, with no climbing of ladders, ropes or scaffolds. She cannot reach with either arm or hand, say, any significant extent. There is also limited ability to move the head from side-to-side or down so that that can be done occasionally.

(Tr. 465). The VE responded that there would not be any jobs that such an individual would be able to perform. (*Id.*).

## III.  MEDICAL HISTORY

Plaintiff was injured in a work-related automobile accident on January 4, 1993. (Tr. 215). Though records of Plaintiff's treatment immediately after her accident are not available, Plaintiff reported to Dr. Pupillo that she developed an acute onset of neck pain and developed

6

severely painful paresthesias almost immediately in both hands after the accident.[4] (*Id.*).

Plaintiff also developed low back pain within a day or two of the accident. (*Id.*). In a letter to

Dr. Grear, Dr. Pupillo stated Plaintiff's accident caused an acute cervical disc herniation with

some evidence of cord compression and chronic lumbosacral strain, but also noted that Plaintiff

walked with a normal gait. (Tr. 216).

 In January, 1993, Plaintiff under went various exams related to her injuries from her

accident. On January 9, 1993, a radiology consultation report ordered by Dr. Pupillo indicated

normal cervical alignment with fusion at C5-C6. (Tr. 164). A January 11, 1993, radiology

report prepared by Dr. Cottrell indicated no injury to Plaintiff's lumbar spine. (Tr. 161).

 Plaintiff met with Dr. Michael Grear on March 12, 1993. (Tr. 305). Plaintiff noted her

pain had not gone away since her accident. (*Id.*). Dr. Grear's clinical examination revealed

twenty percent loss of Plaintiff's left and right lateral rotation. (*Id.*). Dr. Grear also noted trace

paraspinal muscle spasm in Plaintiff's cervical spine. (*Id.*). Dr. Grear prescribed Naprosyn[5] and

Flexeril,[6] and he recommended mild home stretching exercises. (*Id.*). He opined that he

believed Plaintiff would improve with conservative management and that Plaintiff could

continue with light duty work. (*Id.*). On March 16, 1993, Plaintiff underwent a partial bone scan

ordered by Dr. Grear. (Tr. 211). Images of Plaintiff's spine, skull, shoulders, ribs, pelvis, and

hips were normal. (*Id.*).

---

[4]Plaintiff reported to Dr. Nimmer on July 14, 1994, that she was initially treated after her accident at Lutheran General Hospital where X-rays were taken and Plaintiff was given a neck brace. (Tr. 232).

[5]Naprosyn is a non-steroidal anti-inflammatory drug. PHYSICIAN'S DESK REFERENCE (59th Ed. 2874).

[6]Indicated for relief of muscle spasm. PHYSICIAN'S DESK REFERENCE (59th Ed. 1930-31).

On March 23, 1993, Dr. Grear reported the he felt comfortable allowing Plaintiff to resume activity as a truck driver with no lifting greater than twenty-five pounds. (Tr. 308). Dr. Grear continued Plaintiff on Naprosyn and stopped the Flexeril. (*Id.*). On March 30, 1993, Dr. Grear noted that Plaintiff was experiencing a fair amount of pain and difficulty sleeping. (*Id.*). He prescribed Darvocet, Vicodin, and Naprosyn.[7] (*Id.*).

On April 20, 1993, Plaintiff reported doing well with Darvocet and Naprosyn, but stated Vicodin made her too sleepy. (*Id.*). Plaintiff reported mild discomfort in her proximal left humerus. (*Id.*). Dr. Grear affirmed that Plaintiff could continue working without significant restrictions. (*Id.*). On May 4, 1993, Plaintiff reported pain in her cervical and lower lumbar spine, as well as paraspinal muscle spasm. (*Id.*). Dr. Grear recommended physical therapy with hot packs, ultrasound, and dynawave. (*Id.*). Dr. Grear also noted that Plaintiff's medications were upsetting her stomach, so he did not give any new prescriptions. (Tr. 309).

From May 5, 1993, to May 28, 1993, Plaintiff attended physical therapy. (Tr. 219). On May 5, 1993, Dr. Grear ordered a MRI of Plaintiff's *cervical* spine. (Tr. 213). A defect was present upon the thecal sac at the C5-C6 disc space level and the cervical cord appeared compressed and indented at the C5-C6 disc space level. (*Id.*). The radiologist's impression was recorded as "[c]entrally herniated C5-C6 disc with cord compression without cord edema." (*Id.*). Dr. Grear ordered a MRI of Plaintiff's *lumbar* spine on May 21, 1993. (Tr. 212). No defects were noted, and the radiologist's impression was recorded as "[n]ormal MRI study of the lumbar spine." (*Id.*).

On May 19, 1993, Plaintiff's medications were switched to Motrin and Tylenol #3 because of Plaintiff's stomach distress. (Tr. 309). Dr. Grear opined that conservative treatment

---

[7]Darvocet and Vicodin are indicated for relief of mild to moderately severe pain. PHYSICIAN'S DESK REFERENCE (59th Ed. 402, 526).

and avoidance of surgical intervention could be successful. (*Id.*). Plaintiff was started on cervical traction for the spine in her physical therapy. (*Id.*). On June 6, 1993, Dr. Grear resumed Plaintiff's treatment with Naprosyn and referred her to Dr. Lou Pupillo. (*Id.*). Dr. Grear opined that Plaintiff should not return to work as a truck diver, but stated she could do clerical activities as long as she did not lift more than fifteen pounds. (*Id.*). Plaintiff's physical therapy progress report of June 8, 1993, stated that Plaintiff was treated with electric stimulation, cervical traction, ultrasound, and hot packs for twelve sessions. (*Id.*). Plaintiff continued to report pain post-treatment, including muscle spasm in her trapezious and rhomboid and pain upon rotating her neck. (*Id.*). Physical Therapist, Laura Teven, noted that Plaintiff relied on her pain medication too much, and stated that Plaintiff was given a home cervical traction unit. (*Id.*).

On June 28, 1993, Plaintiff was admitted to the Holy Family Hospital due to neck and left arm pain. (Tr. 210). A myelography was performed on Plaintiff, indicating a defect at C5-6 and minimal bulges at 3-4 and 4-5 and 5-1. (Tr. 208-210, 218). Plaintiff noted persistent low back pain, but her range of motion was normal. (Tr. 218). Plaintiff's strength was much improved. (*Id.*). Dr. Pupillo suggested conservative treatment with epidural blocks in both the cervical and lumbar areas. (*Id.*).

In July and August 1993, Plaintiff underwent multiple epidural blocks with steroid injections for lumbar radiculopathy. (Tr. 219). Plaintiff received her first lumbar epidural block with steroid injection on July 19, 1993, and later injections on July 27 (cervical), August 4 (lumbar), and August 24, 1993 (cervical). (Tr. 189, 192, 200, 207, 219).

On September 9, 1993, Plaintiff consulted with Dr. John Ruge, a specialist in neurological surgery. (Tr. 219-221). Plaintiff explained that her pain was worse since her accident, and that she had lost strength in both arms. (*Id.*). She also felt it was dangerous for her

9

to drive. (Tr. 219). Dr. Ruge noted that Plaintiff had returned to light desk-duty at her job from February 15, 1993 to April 27, 1993, and recommended that she not work because of her progressive symptomatology. (Tr. 219-20). Dr. Ruge also stated that Plaintiff had signs of codeine addiction or allergy. (*Id.*). Dr. Ruge opined that Plaintiff sustained a mild form of a central spinal cord injury and recommended re-imaging and a MRI scan of the cervical spine to look for syringomyelia and an anterior cervical diskectomy at C5-6 with fusion if his suspicion was confirmed by the MRI. (*Id.*).

An MRI of Plaintiff's cervical spine on September 24, 1993, revealed extradural compression of the thecal sac at C5-6, suggestive of a central disc herniation. (Tr. 222). No compression of the cord was noted. (*Id.*).

Plaintiff underwent an anterior diskectomy and bone graft fusion at C5-C6 on October 20, 1993, at Holy Family Hospital. (Tr. 169, 223). Before surgery, Plaintiff indicated she felt neck pain with pain in her upper extremities. (Tr. 182, 187). She also reported low back pain, pain in both of her legs, and tingling in one foot. (*Id.*). A very mild disturbance of the right ulnar nerve at the elbow within normal limits was recorded. (Tr. 183). After surgery, Plaintiff was started on physical therapy without any difficulty and was discharged on October 24, 1993. (*Id.*). Her discharge diagnosis was a herniated disk and hypercholesterolemia. (*Id.*). A low cholesterol diet was recommended, and Plaintiff was prescribed Darvocet. (*Id.*).

Plaintiff participated in a work-hardening program from June 7, 1993, to June 24, 1993, followed by a visit with Dr. Nimmer at Resurrection Medical Center on July 14, 1994. (Tr. 230-32). Plaintiff reported pain in her back which occurred twenty minutes after any activity, and she stated she was unable to use her right arm due to pain. (*Id.*). She also noted needle like sensations in three fingers of her left hand. (*Id.*). Plaintiff saw Dr. Nimmer again on August 4,

10

1994. (Tr. 230). Plaintiff reported pain in her back, especially when she changed positions. (*Id.*). Dr. Nimmer noted that Plaintiff could walk and climb stairs without difficultly, and recommended continued physical therapy. (*Id.*).

On September 8, 1994, Dr. Nimmer noted that Plaintiff remained concerned about her low back pain, right calf, and tingling in her left foot. (Tr. 225). Plaintiff also complained of neck pain when she was reading or driving, further noting that her lips would go numb. (*Id.*). Plaintiff reported that she experienced pain after walking short distances, especially in her right calf. (*Id.*). Dr. Nimmer continued Plaintiff with physical therapy/vocational counseling and opined that "it's been far too long that she has not been back in a regular job situation." (*Id.*).

On September 29, 1994, Plaintiff reported continued neck pain, so Dr. Nimmer administered an injection of Depo-Medrol and Xylocaine for pain relief. (Tr. 224). On October 13, 1994, Dr. Nimmer questioned Plaintiff about the effect of the injection. (Tr. 223). Dr. Nimmer recorded that Plaintiff felt relief for three hours from the anesthetic, and lessened pain for a week, but then her stabbing pain returned. (*Id.*). Dr. Nimmer recommended a work-hardening program for two more weeks and then suggested vocational rehabilitation. (*Id.*).

Plaintiff regularly saw Dr. Pupillo or a physical therapist working with Dr. Pupillo January 11, 1993, through November 22, 1994. (Tr. 317-331). It appears from Plaintiff's medical records that Plaintiff remained sore and in pain throughout her physical therapy, but Dr. Pupillo frequently remarked that Plaintiff was doing well. (Tr. 329). In December, 1993, Dr. Pupillo noted that Plaintiff wanted to go to Florida. (*Id.*). He advised Plaintiff that she could go, but could not drive herself. (*Id.*). In May, 1994, Dr. Pupillo released Plaintiff for "light-medium work." (Tr. 330). On July 7, 1994, Dr. Pupillo found "a trigger point" in Plaintiff's neck consistent with Fibromyalgia, but could not later find the trigger on November 22, 1994. (Tr.

330-31). Dr. Pupillo released Plaintiff to vocational rehabilitation in November, 2004, as well. (Tr. 331).

Plaintiff saw Dr. Irwin Barnett, an orthopedic specialist, on March 9, 1995. (Tr. 233). Plaintiff reported to Dr. Barnett that she had been told she may have Fibromyalgia. (*Id.*). Plaintiff complained that her neck and back hurt most of the time, more so in the neck. (*Id.*). She also complained about her legs and tingling in her toes and feet. (*Id.*). Plaintiff performed heel to toe walking normally. (*Id.*). The Ely Sign, Gaenslen Sign, Faber Sign, and Laseque Sign were all negative. (*Id.*). Dr. Barnett diagnosed Plaintiff with a residual spine injury with bilateral sciatic nerve root irritation, herniated disc at C5-6 and herniated disc syndrome in the cervical spine. (Tr. 235). Dr. Barnett opined that Plaintiff "has a major loss of use of the man as a whole on an industrial basis." (Tr. 236).

Plaintiff saw Dr. Veena Nayak, an internal medicine specialist, on August 8, 1997, for neck, back, heel, and thigh pain. (Tr. 248). At the time, Plaintiff was taking no medications. (*Id.*). Dr. Nayak noted no evidence of synovitis, but did note Fibromyalgia with severe muscle spasm in Plaintiff's periscapular and paraspinal regions, hypercholesterolemia, and mild elevation of GGT, most likely secondary to fatty liver. (*Id.*). Plaintiff was advised against continued smoking and moderate alcohol intake. (*Id.*). Plaintiff was prescribed Lescol for her high cholesterol and Zoloft for her symptoms of underlying Fibromyalgia. (*Id.*). Water exercises were recommended. (*Id.*).

Plaintiff saw a physical therapist, Janice Hussong, on July 21, 1997. (Tr. 252). Plaintiff reported that use of her arms produced a sensation of being touched with a stun gun with resulting immobility of her arms. (*Id.*). She described thigh and calf pain like being sliced to the bone, and stated walking was difficult due to lower back pain. (*Id.*). She stated her pain from

her neck radiated down to her arms, wrists, hands, fingers, back, left hip/buttock, thighs, calves, ankles, heels, and feet. (*Id*.). Plaintiff expressed that looking down and swallowing made her gag or vomit, and that talking too much made her lose her voice. (*Id*.). Plaintiff's medications at the time included four Anacin per day. (*Id*.). Plaintiff believed she had gained twenty pounds since her injury, and she rated her pain as a ten (on a scale of zero (no pain) to ten (constant pain)), and her frequency of pain as an eight to ten. (Tr. 252-53). Plaintiff stated she usually sleeps from nine to eleven at night and six to eight in the morning. (Tr. 253). Plaintiff complained that activity increased her pain, and stated she lays flat on her back to decrease her pain. (*Id*.). She stated she could drive for an hour at the most. (*Id*.). Ms. Hussong recommended myofascial release and a muscle strengthening program. (Tr. 254).

Plaintiff underwent a psychiatric evaluation with consulting psychiatrist, Dr. John Conran, on September 5, 1997. (Tr. 255). Plaintiff reported that she was taking Zoloft and Lescol. (*Id*.). Plaintiff noted her symptoms for Dr. Conran, including generalized pain upon minimal activity and difficulty sleeping. (*Id*.). Plaintiff said she did not go out very often, usually three times a week to do errands. (*Id*.). Dr. Conran recorded the results of Plaintiff's mental exam in his report, noting that Plaintiff was oriented x3, sad at times, and in some discomfort. (*Id*.). He noted no evidence of thought disorder, but did diagnose depression reactive to chronic severe pain. (Tr. 257).

On September 12, 1997, Plaintiff underwent an internal medicine evaluation with consulting physician, Dr. Peter Biale. (Tr. 259). Plaintiff reported taking Lescol. (*Id*.). Plaintiff reported that she had Fibromyalgia and felt fatigued most of the time. (*Id*.). Dr. Biale noted that Plaintiff's head, eyes, ears, nose, and throat were normal. (Tr. 260). He also reported that Plaintiff experienced "excruciating" pain in the left shoulder which radiates to the left arm when

13

she rotates her head to the left. (*Id.*). Full range of motion of all joints was noted, but a few trigger points were found on Plaintiff's thighs and arms. (*Id.*). Plaintiff was able to walk normally, heel to toe and squat down. (*Id.*). Finger grasp and hand grip was unimpaired. (*Id.*). Dr. Biale's clinical impression for Plaintiff was limited motion of the cervical spine, low back pain, and Fibromyalgia. (*Id.*). He also noted that Plaintiff could not take a stronger analgesic for her pain because of side effects. (*Id.*).

On September 29, 1997, Dr. Tomasetti completed a Psychiatric Review Technique Form for Plaintiff. (Tr. 266, 269). Dr. Tomasetti found that Plaintiff's depressive reaction to pain fell under Listing 12.04 (Affective Disorders), but opined that her mental impairment was not severe. (*Id.*). Dr. Tomasetti noted that Plaintiff's restrictions on daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace were slight. (Tr. 273). Dr. Tomasetti noted no episodes of deterioration or decompensation. (*Id.*). Dr. Fullilove agreed with Dr. Tomasetti's findings in a Medical Consultant's Review Form, also dated September 29, 1997. (Tr. 264).

Dr. Boyd McCracken, a state agency physician, completed a Residual Functional Capacity Assessment Form ("RFC") for Plaintiff on October 7, 1997. (Tr. 275-82). Dr. McCracken reported that Plaintiff could occasionally lift/push/pull twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 276-77). Dr. McCracken noted no postural limitations for Plaintiff other than stating that Plaintiff should never use ladders, ropes or scaffolds, and should only occasionally climb ramps and stairs. (*Id.*). No visual, communicative, or environmental limitations were recorded for Plaintiff, but Plaintiff was restricted from reaching above shoulder height. (Tr.

14

278). Dr. Leonard Weinstien agreed with Dr. McCracken's evaluation on November 26, 1997. (Tr. 284).

At the request of DDS, Dr. Nayak completed a statement of opinion about Plaintiff's ability to do work related activities on January 9, 1998. (Tr. 286-90). Dr. Nayak reported that Plaintiff suffered from Fibromyalgia, C5-6 Radiculopathy, and neck pain. (Tr. 287). Dr. Nayak stated that Plaintiff was unable to lift, carry, handle objects, sit/stand for prolonged periods due to her Fibromyalgia. (Tr. 288). Dr. Nayak's report did not list Plaintiff's trigger points, but noted paraspinal and periscapular tenderness. (Tr. 248). Dr. Nayak also reported that Plaintiff's liver enzyme abnormalities did not affect her ability to work. (Tr. 290).

Dr. McCracken completed a second Residual Functional Capacity Assessment Form ("RFC") for Plaintiff on January 15, 1998. (Tr. 291-98). Dr. McCracken reported that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 292). Dr. McCracken modified his original RFC, limiting Plaintiff's ability to push and pull with her upper extremities. (Tr. 292). Previously, Dr. McCracken noted no postural limitations for Plaintiff other than stating that Plaintiff should never use ladders, ropes or scaffolds, and should only occasionally climb ramps and stairs. (*Id.*). In this report, Dr. McCracken added two postural limitations, noting Plaintiff should be further limited to occasionally stooping and crouching. (Tr. 293). No visual, communicative, or environmental limitations were recorded for Plaintiff, but Plaintiff was again restricted from reaching above shoulder height. (Tr. 294).

On May 13, 1999, Plaintiff saw Dr. Charles O'Laughlin. (Tr. 383). Plaintiff reported to Dr. O'Laughlin that she could not move her head backward before her surgery, but after the surgery, she could not move it forward without pain. (*Id.*). She also stated she could not talk for

ten days after her surgery, stating damage to her vocal cords was suspected. (Tr. 383-84). Plaintiff stated she had not been evaluated by an ears, nose and throat specialist. (Tr. 384). Plaintiff told Dr. O'Laughlin that she could sit for two hours at a time, lift five to ten pounds, stand up to ten minutes, and walk not very far at all. (*Id.*). Plaintiff reported that she was taking aspirin for her pain. (*Id.*). Plaintiff noted her pain restricted her ability to grip, drive, sleep through the night, and gargle. (*Id.*).

Dr. O'Laughlin's exam revealed that Plaintiff was able to walk without a limp and touch her toes, and that she had a normal range of motion. (Tr. 385). Plaintiff's grip strength was recorded as thirty pounds on the right and thirty-five pounds on the left. (*Id.*). No atrophy of muscles was recorded. (*Id.*). No objective physical findings that would indicate significant ailments were present. (*Id.*). Dr. O'Laughlin's report stated that "[t]he so called fibromyalgia that she has is inconsistent and palpation (testing for trigger points) in multiple areas reveals only a few isolated areas of tenderness, nothing really that could be called fibromyalgia." (*Id.*). Dr. Laughlin also stated that a review of Plaintiff's medical records did not contain a consultation with a rheumatologist nor an actual diagnosis of fibromyalgia. (*Id.*). Finally, Dr. O'Laughlin noted that Plaintiff "has no motivation to do any type of work activities" as "her boyfriend basically provides for her." (Tr. 386).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh

the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm unless there is an error of law. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.     **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[8] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to

---

[8]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[9] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. §

---

[9]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

### A.   Step One: Is the claimant currently engaged in substantial gainful activity?

ALJ Bretthauer found no evidence that Plaintiff had engaged in disqualifying substantial gainful activity at any time since Plaintiff's alleged onset date.[10] (Tr. 21). Neither party disputes this first determination, and there is substantial evidence to support the ALJ's finding. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

**B.    Step Two: Does the claimant suffer from a severe impairment?**

In performing the Step Two Analysis, ALJ Bretthauer found that Plaintiff's medical reports show that Plaintiff "has status post anterior discectomy and fusion of the cervical spine at the C5-6 level; lower back pain; and questionable fibromyalgia." (Tr. 22). From this, the ALJ concluded that Plaintiff's impairments were severe within the meaning of the Regulations.[11] (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Two of the Analysis be affirmed.

**C.    Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?**

In performing the analysis for Step Three, ALJ Bretthauer determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.[12] (Tr. 22). Specifically, the ALJ found that

---

[10] ALJ Brown also found no evidence that Plaintiff had engaged in disqualifying substantial gainful activity at any time since Plaintiff's alleged onset date. (Tr. 33).

[11] ALJ Brown also found Plaintiff's limitations met the definition of severe.

[12] ALJ Brown also found Plaintiff's impairments did not meet or equal the criteria of any of the Listings. (Tr. 33).

Listing 1.04A (Disorders of the Spine) criteria were not satisfied for the durational requirement of twelve continuous months due to an absence of persistent physical findings establishing the presence of requisite neurologic deficits such as sensory or reflex loss. (*Id.*).

The Magistrate Judge agrees that Plaintiff's symptoms do not appear to rise to the level of Listing 1.04A or any of the Musculoskeletal Impairment Listings. Additionally, neither party challenges the ALJ finding under Step Three. Therefore, because substantial evidence exists to support the ALJ's Step Three finding, this court finds no reason to disturb it. It is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

**D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis under Step Four, ALJ Bretthauer determined that Plaintiff no longer has the residual functional capacity to perform her past relevant work as a delivery driver. (Tr. 25, 27). Before doing so, the ALJ determined Plaintiff's RFC. (*Id.*). The RFC is what a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. After considering the entire record, the ALJ stated that Plaintiff had the residual functional capacity for a significant range of light work.[13]  (*Id.*). More specifically, the ALJ concluded that Plaintiff retained the following RFC:

> lift and carry 20 pounds occasionally and 10 pounds frequently; sit
> for a total of at least 6 hours in an 8-hour workday; stand/walk for
> a total of at least 6 hours in an 8-hour workday; stoop, crouch, and

---

[13] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of these activities. 20 C.F.R. §404.1567(b).

climbs stairs/ramps not more than occasionally; and push/pull on a
non-repetitive basis. The claimant is unable to climb ladders,
ropes or scaffolds or to reach overhead.

(Tr. 27).[14]

In support of her RFC statement, ALJ Bretthauer expressed that Plaintiff's objective

medical record failed to provide support for Plaintiff's subjective allegations of disabling

symptoms and limitations. (Tr. 23). Specifically, the ALJ noted that Plaintiff's daily activities

were not limited to the extent one would expect, given Plaintiff's complaints of disabling

symptoms, because Plaintiff cooks, dusts, does laundry, shops for groceries with assistance, takes

trips, goes to the racetrack, and takes care of her personal hygiene including washing and

combing her hair, which is quite long. (*Id.*). The ALJ also noted that Plaintiff's record had

significant gaps (between November, 1994 and July, 1997) where Plaintiff received no medical

treatment related to her alleged disability. (Tr. 24). The ALJ further noted that Plaintiff's

explanation for not seeking treatment (Plaintiff stated she had no insurance and could not afford

treatment) was contradicted by Plaintiff's worker's compensation settlement of $60,000.00.

(*Id.*). Finally, the ALJ noted that Plaintiff had not seen a rheumatologist, nor did she use

prescription medications consistently to treat her pain. (*Id.*).

---

[14]ALJ Brown found that Plaintiff had the RFC to perform the requirements of work except for :
standing or walking for more than a total of 2 hours in an eight
hour workday; lifting more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers
and small tools; performing activities such as bending, stooping,
crouching, kneeling, and crawling more than occasionally;
climbing ropes, scaffolds, and ladders; and reaching with either the
left or right arm/hand to any significant extent. The claimant has
"slight" restriction of daily living activities; "slight" difficulties in
maintaining social concentration; "seldom" has deficiencies of
concentration, persistence or pace resulting in failure to complete
tasks in a timely manner and "never" had episodes of deterioration
or decompensation in work settings.
(Tr. 41).

The ALJ also used Plaintiff's medical record to support her RFC. First, she noted that Plaintiff's treating neurosurgeon, Dr. Pupillo, never imposed any greater work restrictions on Plaintiff after he released Plaintiff to light-medium work on May 10, 1994. (Tr. 24). Second, she noted that Plaintiff's RFC assessment based on a May, 1999 examination from Dr. O'Laughlin stated that Plaintiff had no supportable functional limitations. (*Id*.). Though one of Plaintiff's physicians, Dr. Nayak, indicated greater limitations than those included in the ALJ's RFC, the ALJ stated Dr. Nayak relied quite heavily and uncritically on Plaintiff's subjective reports, and Dr. Nayak did not have the benefit of reviewing Plaintiff's complete medical record. Finally, the RFC conclusions reached by the physicians employed by DDS supported findings of "not disabled." (*Id*.).

The ALJ's RFC determination is challenged by Plaintiff. At issue is: (1) whether there is substantial evidence in the record to support the ALJ's finding that Plaintiff can perform light work and (2) whether the ALJ's decision is based on an error of law. Plaintiff argues that the ALJ's RFC is unsupported because the ALJ based her RFC on a wrongful credibility determination and a wrongful Mental Impairment Assessment. Defendant asserts that the ALJ's RFC is substantiated by Plaintiff's medical record and should be upheld.

The court's own review of the record as a whole revealed no errors of law, and the court agrees that the ALJ's ruling is supported by substantial evidence. Plaintiff retained the ability to do small chores like preparing dinner, dusting, and laundry. (Tr. 450). She also managed a car trip to Florida in 1993 and traveled to Philadelphia in 1995 or 1996 for a funeral. Plaintiff also visited family and friends and regularly visited a racetrack. (Tr. 454-56, 438). Plaintiff did not seek medical treatment between 1994 and 1997. (Tr. 441). Plaintiff stopped taking prescription

medications and used Aspirin or Anacin to treat her pain. (Tr. 443-44). Plaintiff did not seek mental health treatment, and stated her confusion was "not that severe" at her hearing. (Tr. 444). Dr. Tomasetti opined that Plaintiff's mental health impairments were not severe and noted only slight restrictions of Plaintiff's daily living activities and social functioning. (Tr. 273). Dr. Biale stated Plaintiff's finger grasp and hand grip were unimpaired and noted a full range of motion. (Tr. 260). Dr. Grear opined that Plaintiff would improve with conservative treatment and released Plaintiff to light work and also truck driving with no greater lifting than twenty-five pounds in 1993. (Tr. 308). No defects were noted in Plaintiff's lumbar spine, and Plaintiff underwent an anterior diskectomy to correct her cervical spine problems. (Tr. 223). Dr. Pupillo suggested conservative treatment for Plaintiff. (Tr. 218). Dr. Nimmer treated Plaintiff conservatively and opined that "it's been far too long" for Plaintiff to not be doing regular work and released her to light-medium work in 1994. (Tr. 225, 330).

Though Plaintiff stated that Dr. Pupillo told her she had Fibromyalgia, Dr. Pupillo only mentioned that he found "a trigger point" consistent with Fibromyalgia in July, 1994. (Tr. 233, 330-31). Four months later, Dr. Pupillo could not locate a trigger point. (Tr. 331). There was never a clear diagnosis of Fibromyalgia, and Plaintiff never saw a Rheumatologist regarding Fibromyalgia symptoms. Generally, persons with Fibromyalgia exhibit pain at several trigger points, usually at least eleven out of eighteen, to be diagnosed with Fibromyalgia. Here, Dr. Pupillo only referred to one trigger point in Plaintiff's neck, and Dr. O'Laughlin opined that Plaintiff's "so called fibromyalgia . . . is inconsistent and palpation in multiple areas reveals only a few isolated areas of tenderness, nothing really that could be called fibromyalgia." (Tr. 385).

The only other doctor to reference trigger points in Plaintiff's records was Dr. Biale, who vaguely mentioned trigger points in Plaintiff's thighs and arms. (Tr. 261).

Even though Plaintiff was given the opportunity to submit new medical evidence or treating source comments on the report of Dr. O'Laughlin, no such reports were submitted between her hearing before ALJ Brown and her hearing before ALJ Bretthauer. (Tr. 23). Also, a state agency physician found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 292). This, and all of the evidence noted by the ALJ, leads this court to its position that the ALJ's finding that Plaintiff can perform light work is reasonable and supported by the record. Further, Plaintiff's points of contention, which fall into two main categories addressed below, do not trigger a reversal or remand of the ALJ's decision.

**1.     The ALJ's Credibility Determination Was Reasonable**

Plaintiff argues that the ALJ's credibility determination was erroneous. Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). In evaluating credibility, the ALJ must follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p. In particular, where an ALJ rejects subjective complaints of pain, after the presence of a medically determinable impairment is established, "the ALJ is obliged to examine and weigh all the evidence including observations by treating physicians, third-party testimony and daily activities, functional restrictions, pain medication taken, and aggravating or

precipitating factors." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)(citing S.S.R. 88-13). Accordingly, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination.[15] Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

Even though rational minds may disagree as to the outcomes flowing from testimony presented, the court will uphold the ALJ's decision if substantial evidence underpinning it exists. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). In this case, the ALJ found Plaintiff's allegations regarding her limitations "not totally credible" because: (1) the severity of Plaintiff's impairments was not paired with persistent objective findings, (2) Plaintiff did not seek the type of treatment one would expect with severe impairments, (3) Plaintiff stated her mental confusion was not that severe, (4) Plaintiff did not take the type of medications one would expect for severe impairments, (5) no new medical evidence or treating source comments were proffered by Plaintiff to contest the findings of Dr. O'Laughlin, (6) Plaintiff's daily activities were not limited to the extent one would expect given Plaintiff's complaints of disabling symptoms because Plaintiff took long car trips, frequented the racetrack, visited her family, and did cooking, laundry, and dusting, (7) Plaintiff stated at her hearing that she thought she had seen a rheumatologist between November, 1994 and July, 1997, referring to Dr. Nimmer, but Plaintiff did not see Dr. Nimmer after September 29, 1994, nor was Dr. Nimmer a rheumatologist, (8)

---

[15]Note, however, that with credibility determinations based on "objective factors or fundamental implausibilities rather than subjective considerations," the court has greater latitude to review the ALJ's determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)(citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

Plaintiff stated she could not afford medical treatment, but Plaintiff received a worker's compensation settlement of $60,000.00, (9) Dr. Pupillo did not retract his release of Plaintiff to "light-medium" work, and (10) Dr. O'Laughlin stated Plaintiff had no supportable functional limitations. (Tr. 23-24, 27).

As required by SSR 96-7p, the ALJ's credibility assessment takes into account Plaintiff's entire case record, including the objective medical evidence, Plaintiff's own statements about her symptoms, information provided by treating and examining physicians, and other relevant evidence including the Plaintiff's daily activities and the type, dosage, and effectiveness of medication the Plaintiff takes. Further, the ALJ's statements are sufficiently specific to allow subsequent reviewers to follow the ALJ's reasoning. While failure of a claimant to seek medical treatment is not a defense to a claim for disability benefits, the failure to seek medical attention and low dosage use of pain medication does cast doubt upon the seriousness of a claimant's impairments. *Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1988).

While Plaintiff argues that the ALJ ignored her reasons for not taking medications and for not seeking medical care, it is abundantly clear that the ALJ reached her conclusion despite having considered Plaintiff's statements and all of the medical evidence. The ALJ found Plaintiff's subjective complaints exaggerated compared to her longitudinal medical record. By pointing out each of the above discrepancies with Plaintiff's subjective complaints and the objective evidence, the ALJ built up solid support in the record for her decision. The ALJ's conclusion is not patently wrong, and it is not the role of the court to re-weigh the evidence. Thus, this court finds that the ALJ's credibility determination was grounded in the record and adequately justified in her opinion. As such, the court finds no reason to recommend reversing or remanding the ALJ's finding for a new credibility determination.

28

## 2. The ALJ's Mental Impairment Assessment Was Reasonable

Plaintiff contends that the ALJ erred as a matter of law when she did not send Plaintiff to psychological testing and included no mental component in Plaintiff's RFC. Defendant argues that the ALJ adequately considered Plaintiff's mental condition in evaluating her impairments. Admittedly, it appears that Plaintiff suffers from some depression related to her pain. Thus, the extent of Plaintiff's depressive reaction and the need for further testing is at issue.

According to social security regulations, a consultative examination may be required when the evidence as a whole, both medical and non-medical, is insufficient to support a decision on a claim. 20 C.F.R. § 404.1519a. In this case, Plaintiff's last psychiatric evaluation took place on September 5, 1997, not quite five years before Plaintiff's May, 2002, hearing before ALJ Bretthauer. Dr. Conran, who completed Plaintiff's psychiatric evaluation, diagnosed Plaintiff with depression reactive to chronic pain, but did not note mental abnormalities or place limitations on Plaintiff's mental functioning. (Tr. 255-58). Plaintiff never underwent any psychological testing. Plaintiff was prescribed Zoloft in August, 1997, by Dr. Nayak, but the prescription was for underlying symptoms of Fibromyalgia, not necessarily depression. (Tr. 248). At her own hearing, Plaintiff stated her mental confusion was "not real severe." (Tr. 444). Plaintiff could not recall if she had told her doctors of her confusion by 1997 or 1998. (*Id.*).

Additionally, on September 29, 1997, Dr. Tomasetti completed a Psychiatric Review Technique Form for Plaintiff, noting that Plaintiff's restrictions on daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace were slight. (Tr. 266, 269, 273). ALJ Brown, who completed a Psychiatric Review Technique Form for Plaintiff in 1999 found that: "[t]he claimant has 'slight' restriction of daily living activities; 'slight' difficulties in maintaining social concentration; 'seldom' has deficiencies of

29

concentration, persistence or pace resulting in failure to complete tasks in a timely manner and 'never' had episodes of deterioration or decompensation in work settings." (Tr. 41).

This evidence appears adequate to support the ALJ's decision not to include a mental component to Plaintiff's RFC. The record as a whole is not insufficient for the ALJ to make a fair evaluation of the mental aspects of Plaintiff's condition. Because there is no record of severe or even marked restrictions on Plaintiff's activity due to a mental condition, and the ALJ provided a reasonable analysis, this court finds no reason to remand for new evaluation of Plaintiff's mental condition.

Finding the ALJ's RFC supported by substantial evidence in the record and finding Plaintiff's arguments against the ALJ's Step Four analysis unpersuasive, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Four of the Analysis be affirmed.

**E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?**

At Step Five, the ALJ relied on the Medical-Vocational Guidelines ("the Grids") and the testimony of a Vocational Expert ("VE") to determine if Plaintiff could perform substantial gainful work that exists in the national economy. (*See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28). Based on Plaintiff's RFC (allowing for performance of a significant range of light work) and Plaintiff's status as a younger individual with more than a high school education (*see* 20 C.F.R. 404.1563), the ALJ reached a finding of "not disabled." (Tr. 25-28).

Specifically, the ALJ found, based on the VE's testimony, that Plaintiff could find work in the regional economy as a cashier (32,000 jobs), packer (6,400 jobs), and assembler (12,000 jobs). Other than disputing the ALJ's finding that Plaintiff could do a significant range of light

work, Plaintiff does not dispute the ALJ's analysis at Step Five. The ALJ's RFC has already been reviewed and approved of in this court's Step Four Analysis. Substantial evidence exists in the record supporting the ALJ's decision. Therefore, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Five of the Analysis be affirmed.

VII.   **CONCLUSION**

In accordance with the above, it is the Magistrate Judge's Report and Recommendation that the ALJ's decision to deny benefits to Plaintiff be sustained, affirming the ALJ at all steps of the disability determination process as outlined above. It is the Magistrate Judge's further Recommendation that Defendant's Motion for Summary Judgment be granted, and Plaintiff's Motion for Summary Judgment on the administrative record and pleadings be denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 1 6 05